Wayson W. S. Wong, Esq.
Law Offices of Wayson Wong
142 Seaton Blvd., Suite 203
Hagatna, Guam 96910
Phone: 475-7448



Attorney for Plaintiffs

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| SHAUNANNETTE D. WATSON and GEORGE L. WATSON,<br><br>           Plaintiffs,<br><br>vs.<br><br>GARRY M. PASCOE, AMERICAN HOME ASSURANCE COMPANY, and DOE DEFENDANTS 1 – 10,<br><br>           Defendants. | CIVIL CASE NO. CV 0318-02<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT; EXHIBITS "A – D"; DECLARATION OF WAYSON W. S. WONG; CERTIFICATE OF SERVICE<br><br>Hrg. Date: November 16, 2004<br>Time:     1:30 p.m.<br>Judge:   Hon. Michael J. Bordallo |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiffs Shaunannette D. Watson and George L. Watson (collectively, the "Watsons"), by and through their attorney, Wayson W. S. Wong, Esq., of the Law Offices of Wayson Wong, A Professional Corporation, oppose defendants' Motion for Summary Judgment.

In the Memorandum of Points and Authorities in support of defendants' Motion for Summary Judgment, they argued that defendant Garry Pascoe was acting in the course and scope of his employment with the United States at the time of the automobile collision involved in this case; and thus, under the Federal Tort Claims Act ("FTCA"), only the United States and not its employee would be liable for Mr. Pascoe's negligence in causing the collision; Mr. Pascoe would be immune from such liability. They further argued that defendant American Home Assurance Company ("American

Home"), as Mr. Pascoe's automobile liability insurer, would also be immune from such liability because of Mr. Pascoe's immunity. Because of such immunity, both defendants contended that they are entitled to summary judgment in their favor.

American Home is not entitled to summary judgment because even if all of its arguments are correct, under those arguments, according to its insurance policy, it still would have liability to the Watsons under another basis. Under those arguments, the United States probably is an additional insured under the American Home policy. Under Guam's direct action statute, American Home then would be liable for the liability of the United States. As the Watsons have already claimed, American Home would be liable to them for their injuries and damages. American Home has failed to show in its Motion for Summary Judgment, how, under these facts and laws, it would be entitled to summary judgment. It cannot show such nonliability.

The Watsons are filing Plaintiffs' Motion for Leave to File First Amended Complaint with this opposing memorandum. They had originally sued American Home for their injuries and damages on the basis of its insured's, Mr. Pascoe's liability to them. In the First Amended Complaint, they just add the additional basis for their claim against American Home, its additional insured's, the United States' liability to them. They ask that this Court postpone its decision on that part of defendants' Motion for Summary Judgment that pertains to American Home until it decides Plaintiffs' Motion for Leave to File First Amended Complaint. The Watsons incorporate by reference that motion and its supporting documents within this opposing memorandum.

Mr. Pascoe and American Home are not entitled to summary judgment because there are genuine issues of material facts as to whether he was in his course and scope of employment with the United States. If he was not, he would have personal liability to the Watsons; and American Home, as his insurer, also would have personal liability to them, up to the amount of its policy limit.

Furthermore, American Home, for itself and as Mr. Pascoe's representative, waived any and all immunity defenses when American Home paid the Watsons' property damages and Mrs. Watson's medical expenses she incurred as a result of the collision; or at least there are genuine issues of material facts about that. For that additional reason, the defendants are not entitled to summary judgment.

2

Pursuant to the attached Declaration of Wayson W. S. Wong, the authenticity of all of the documents attached as Exhibits "A – D" to this memorandum have been established.

## II.   DISCUSSION

### A.   American Home Is Not Entitled to Summary Judgment Because the United States Is Its Additional Insured

As indicated, under the scenario argued by American Home to obtain immunity for Mr. Pascoe and itself with respect to him, it had to show that Mr. Pascoe was in the course and scope of his employment with the United States, and the United States was therefore solely liable for Mr. Pascoe's negligence in causing the Watsons' injuries and damages. But under that same scenario, the United States would become an additional insured under the American Home insurance policy involved; and then, under the Guam direct action statute, American Home would have the same liability of the United States, as its insurer, up to the applicable policy limit. Under such facts presented, American Home should have judgment entered against it, not a dismissal pursuant to summary judgment.

The Watsons believe that the American Home policy involved defines "insured" as follows:

### B.   **"Insured" as used in this Part means**:

1.   You or any "family member" for the ownership, maintenance or use of any auto or "trailer".

2.   Any person using "your covered auto".

3.   **For "your covered auto", any** person or **organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded** under this Part.

Their Counsel wrote to American Home's counsel on October 14, 2004 and asked for its policy definitions of insured; but to date, American Home's counsel has not responded. A duplicate of that letter is attached as Exhibit "A". If American Home provides those definitions before the hearing on its Motion for Summary Judgment, the Watsons will provide them to this Court. If it fails to do that, the Watsons will ask that the hearing be

continued to allow them to obtain such definitions by formal discovery and present them to this Court.

Under American Home's scenario and the bolded portion of the definition of "insured" set forth above, the United States would be an additional insured because it is an organization that would have legal responsibility for acts or omissions of Mr. Pascoe, since he allegedly, under that scenario, was working in the course and scope of his employment with the United States at the time of the collision. Under that scenario, coverage was afforded to Mr. Pascoe. Thus coverage for the United States' liability would have to be extended to the United States, as an additional insured under the policy. American Home would have liability for the United States' liability, up to the American Home policy limit.

The overwhelming case law in support of the United States as an additional insured in FTCA automobile cases involving automobile liability policies and the Watsons' contentions set forth above are also set forth in their counsel's October 31, 2004 letter to American Home's counsel (Exhibit "A"). They all are incorporated by reference into this opposing memorandum.

Such case law and the facts argued by the defendants clearly show that American Home is not entitled to summary judgment. In fact, they show that because the United States would be American Home's additional insured, judgment should be against American Home for the amount of the Watson's injuries and damages, up to its policy limit.

B.    Both Mr. Pascoe and American Home Are Not Entitled to Summary Judgment Because There Are Genuine Issues of Material Facts Regarding Whether He Was in the Course and Scope of His Employment

1.    Pertinent Facts

Defendants have presented some facts, but they did not present the complete pertinent facts. They essentially indicated that he was employed by the United States at the Fire Department at Andersen Air Force Base, on call, and responding to an aircraft on fire at the time when the automobile accident happened.

The other pertinent facts are as follows. Mr. Pascoe lived on Andersen. *See* p. 14. The Fire Department he worked at was on Andersen. *See* p. 19. He usually worked Monday – Friday, from about 7:00 a.m. – 5 p.m., with an hour for lunch. *See* p.

4

23. He had the option of having his lunch at the station or going home or somewhere else for lunch. *See* p. 20. On the day of the accident, he had gone home for lunch. When he was having lunch, he heard the dispatcher on the emergency radio he carried say that there was a helicopter inbound that was reporting smoke and fire on board; he was not directly called to respond. *See* pp. 23 - 24 and 32. He broke away from his lunch to return to the fire station. *See* p. 24. He was using his personally owned 1988 Nissan Maxima. *See* p. 24. He intended to return to the station, park his car, and then use his Government provided vehicle to respond to the emergency. *See* pp. 35 – 36.

While on Plumeria Boulevard, approaching the intersection of it with Ulithi Boulevard, on Andersen, he saw Mrs. Watson's car. He and she were going straight. He wanted to pass her. He tried to pass her when she was turning left onto Ulithi in that intersection. Instead, he collided into her driver's side rear quarter panel. *See* pp. 42 – 48 (intersection collision). The posted speed limit was 15 mph. *See* p. 50. He hit her while going 20 mph; but prior to that, he had braked and slowed his car down. *See* p.54.

Mr. Pascoe knew that according to the rules of the road, it was improper to pass in an intersection. *See* p. 58. He was unaware of any regulation or other law that allowed him to drive his personal auto, even as the assistant fire chief, to pass in an intersection or to exceed the speed limit. *See* pp. 58 – 59.

The page references in the preceding paragraphs are to the pages of the Deposition of Garry M. Pascoe taken for this case on August 12, 2004. Duplicates of those pages are attached to this memorandum as Exhibit "B".

Mr. Pascoe was coming from his home to his work place in his personal auto. He was not called by anyone to return early from his lunch at home. He took it upon himself to do that. As indicated, it was his intention to park his personal auto and then use a Government provided vehicle to respond to the emergency. No matter what, he still was required to obey the rules of the road just like any of us. He failed to do that, and just like any of us would be, he is liable for such failure.

It is well settled that an employee is not acting within the course and scope of his or her employment when going to or coming home from work. *See, e.g., Anderson v. Pacific Gas and Electric Co.*, 14 Cal.App.4th 254, 258, 17 Cal.Rptr.2d 534, 536 (1993), citing to *Ducey v. Argo Sales Co.*, 25 Cal.3d 707, 722, 159 Cal.Rptr. 835 (1979).

An employer is usually exempt from *respondeat superior* or vicarious liability unless the employee's trip to or from work "involves an incidental benefit to the employer, not common to commute trips made by ordinary members of the work force." *Henderson v. Adia Services,* 182 Cal.App.3d 1069, 1073, 227 Cal.Rptr. 745, 747-48 (1986), citing to *Hinman v. Westinghouse Electric Co.*, 2 Cal.3d 956, 962, 88 Cal.Rptr. 188 (1970).

If it were not for the fact that Mr. Pascoe was trying to respond to an emergency at the time of the collision, there would be no question that he would not be in the course and scope of his employment. The emergency caused him to return from his lunch at home earlier than he would have. But what if any employee had lunch at home and had to return to work earlier than he wanted to because he had a meeting scheduled earlier than he wanted it to be scheduled; would a similar question arise? The Watsons think not. That employee's commute would be common to trips made by ordinary members of the work force. Every employee who returns from lunch earlier gives some incidental benefit to his or her employer in being available to do the employer's work earlier. Why would such not be the case with Mr. Pascoe returning to work earlier, even because of the emergency involved? Given the facts, the Watsons believe that reasonable people would differ as to its significance. Some may find it insignificant, and others may find it significant. However, under such circumstances summary judgment is inappropriate, and that decision should be left to the trier of fact. *See Strain v. Williams*, 835 So. 2d 618 (La. App. 2002) (where summary judgment reversed when significance of employee's lunch time accident to employer questioned).

The United States questioned whether Mr. Pascoe was in the course and scope of his employment with it at the time of this collision. It offered the Watsons settlement of only $5,000 on their $250,000 claim perhaps on the belief that he was not in such course and scope. *See* the duplicate of the letter by Lt. Col. John F. McCune of the United States' Air Force to the Watsons' counsel dated 19 Aug 2002, attached as Exhibit "C". Such is further indication that there are genuine issues of material facts as to whether Mr. Pascoe was within the course and scope of his employment at the time of the collision.

C.  American Home, for Itself, and as Mr. Pascoe's Representative, Waived
    any Immunity He May Have Had by Paying for the Watson's Property
    Damages and Part of Mrs. Watson Bodily Injury Medical Expenses

As indicated in Lt. Col. McCune's letter, American Home paid the Watson's
property damages and Mrs. Watson's medical treatment expenses. That was confirmed
by counsel for American Home in his July 22, 2004 letter to counsel for the Watsons, a
duplicate of which is attached as Exhibit "D".

"Waiver is the intentional relinquishment of a known right after knowledge of the
facts." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 31, 44 Cal. Rptr. 2d 370, 387,
900 P. 2d 619, 636 (1995).

American Home's payment of the Watsons' property damages and Mrs.
Watson's medical expenses is evidence of waiver of its right and, as Mr. Pascoe's
representative, his right to claim immunity and deny all liability. Neither of those
defendants has shown this Court that in view of such evidence, they are entitled to
summary judgment as a matter of law. In fact, such payment evidence precludes such
summary judgment.

III.  **CONCLUSION**

By reason of the foregoing, the Watsons respectfully ask this Court to deny the
defendants' Motion for Summary Judgment.

Dated:  Honolulu, Hawaii, November 1, 2004.


Wayson W. S. Wong
Attorney for Plaintiffs

I do hereby certify that the foregoing
s a full true and correct copy of the
original on file to the office of the
clerk of the Superior Court of Guam
Dated at Hagatna, Guam

JUL 1 0 2006

Teresita S. Perez

# LAW OFFICES OF WAYSON WONG

### A Professional Corporation

October 31, 2004 (Hawaii)

## Fax Delivery - (671) 472-5487

Terence E. Timblin, Esq.
Vernier & Maher, LLP
Gov. Joseph Flores Bldg., Ground Flr.
115 Hesler Place
Hagatna, Guam 96910

     Re:   Watson, et al. v. Pascoe, et al., Superior Court
           of Guam, Civ. Case No. CV318-02

Dear Mr. Timblin:

     Upon reviewing case law applicable to your motion for summary judgment, I came across several U. S. Court of Appeals cases (versus the U. S. District Court cases you cited) which indicate that in FTCA cases involving auto accidents, like you allege this one to be, the United States was an additional insured under the auto policies involved in those cases. That was because in those policies, an insured was also defined as an "organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded..." or defined similarly. Those cases are Government Employees Ins. Co. v. United States, 349 F.2d 83 (10th Cir. 1965), cert. denied 382 U.S. 1026, 15 L. Ed. 2d 539, 86 S. Ct. 646 (1966) and United States v. Myers, 363 F.2d 615 (5th Cir. 1966).

     There is no question that American Home afforded coverage for Mr. Garry Pascoe in this case. Also, you and it have taken the position that under the FTCA, the United States would be legally responsible for his negligence in this case. Thus, under an auto policy with the similar definition of insured described above, pursuant to the overwhelming applicable precedent, the United States would be an additional insured under that policy.

     Notwithstanding the arguments you made in support of your motion indicating that the United States would have sole liability between it and its employee, as you very well know, in Guam, direct actions against liability insurers are allowed without even having to named the insureds in the litigation. In other words, in Guam, insureds and their liability insurers have joint and several liability at least up to the insurance policy limit involved.

     We already originally filed our direct action against American Home in this case.

142 Seaton Blvd., Suite 203, Hagåtña, Guam 96910 • Tel: (671) 475-7448 • Facsimile: (671) 477-4455
2326 Aina Lani Place, Honolulu, Hawaii 968226 • Tel: (808) 942-2279 • Fax: (808) 942-2274
Email Address: WaysonWong@aol.com

EXHIBIT " A "

Whether we filed it on the basis of insured Pascoe's negligence or on the basis of additional insured United States' vicarious liability for such negligence should not matter. In terms of American Home, the right insurer defendant has been named for the damages involved. Notice pleading requirements have been met.

To us, if the American Home policy reads like most other standard policies with respect to the definition of "insured" (and like the one in the <u>Government Employees Ins. Co.</u> case cited above), there is no question that American Home has liability in this case; the only question is how much. As the insurer of the United States, it would have liability for its vicarious liability, up to the policy limit involved.

We enclose a copy of the definitions of "insured" under the Insurance Services Office (ISO) standard insurance policy for 1997. We believe that the American Home policy involved would have the same definitions for insured as shown in that ISO policy. Please fax me a copy of the definitions of insured under the American Home policy involved as soon as you can, either today or by noon tomorrow or call me in Hawaii to indicate what the definitions are. As you probably are aware, our memorandum in opposition to your motion for summary judgment is due tomorrow, and we want to include this additional insured argument in it.

We will move for leave to amend the Complaint to alternatively allege vicarious liability against the United States and American Home's liability for the same, up to its policy limit. Such an amendment will not involve naming the United States as a defendant; that is not necessary. By November 5, 2004, please let us know whether you will stipulate to such an amendment. If you will so stipulate, we can then withdraw our motion for leave to amend. Under Rule 15 of the Rules of Civil Procedure of the Superior Court of Guam, such amended claim will relate back to the original claim filed against American Home. It arises out of the same underlying facts.

The only case you cited contrary to the proposition that the United States is an additional insured in an FTCA automobile accident case was <u>Gipson v. Shelley</u>, 219 F.Supp. 915 (E.D. Tenn. 1976); and after we shepherdized it, we saw that judge Neese, who rendered that decision against the clear weight of contrary authority, eventually modified his position in a subsequent case. Additionally, the 1976 date you set forth for the <u>Gipson</u> decision date should be 1963. In <u>United States v. Myers</u>, 363 F.2d 615, 617 - 618 (5th Cir. 1966), cited in the first paragraph of this letter, the Fifth Circuit clearly distinguished <u>Gipson</u> but first set forth the overwhelming contrary authority; it stated:

> In very plain language Mr. Pugh's policy insures any "person or organization legally responsible for the use" of the insured automobile. The only question in the court below was, and in this court is, whether the United States may qualify as an additional "insured" under this language. And we are convinced that this no longer is a question to be answered by

applying the usual rules of contract construction. On the contrary, an unbroken line of cases, presenting this very question and involving the same or very similar contract language, has definitively answered the question in favor of the United States. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Government Employees Ins. Co. v. United States, 349 F.2d 83 (10th Cir. 1965), cert. denied 382 U.S. 1026, 15 L. Ed. 2d 539, 86 S. Ct. 646 (1966); Adams v. United States, 241 F. Supp. 383 (S.D. Ill. 1965); Purcell v. United States, 242 F. Supp. 789 (D.Minn. 1965); United States v. State Farm Mut. Auto. Ins. Co., 245 F. Supp. 58 (D.Ore. 1965); Barker v. United States, 233 F. Supp. 455 (N.D. Ga. 1964); Gahagan v. State Farm Mut. Auto. Ins. Co., 233 F. Supp. 171 (W.D. La. 1964); Nistendirk v. United States, 225 F. Supp. 884 (W.D. Mo. 1964); McCrary v. United States, 235 F. Supp. 33 (E.D. Tenn. 1964); Patterson v. United States, 233 F. Supp. 447; Vaughn v. United States, 225 F. Supp. 890 (E.D. Tenn. 1964); Nistendirk v. McGee, 225 F. Supp. 883 (W.D. Mo. 1963); Irvin v. United States, 148 F. Supp. 25 (D.S.D. 1957); Rowley v. United States, 140 F. Supp. 295 (D. Utah 1956). See also the following unreported cases: Percivill v. United States, 252 F. Supp. 157, W.D.Tex., 1966; United States v. National Ins. Underwriters, Civil No. 3549 (J), S.D. Miss., July 7, 1965; Blagg v. United States, Civil No. 1768, W.D. Ark., April 16, 1964; Town v. United States, No. 64-577-JWC, S.D. Cal., Oct. 30, 1964; Chatham v. Hunt, Civil No. 1972, M.D. Ga., Dec. 30, 1964; Schuessler v. United States, Civil No. 5250, E.D. Ill., June 12, 1964; Davenport v. United States, Civil No. 6-1533-C, S.D. Iowa, Oct. 13, 1964; Gabriel v. United States, Civil No. 64-C-3-D, W.D. Va., ___, 19___; Helms v. United States, Civil Nos. 1735 and 1736, W.D. N.C., August 1963.

It should be noted that while Judge Neese in Gipson v. Shelley, 219 F. Supp 915 (E.D. Tenn. 1963), refused to follow this long line of judicial pronouncements, he subsequently modified his position, although continuing to espouse his dissenting views, in McCrary v. United States, supra. See note 6 infra.

We will have to expend substantial time and effort and our client will incur attorney's fees and costs to continue to defend against your motion for summary judgment as to American Home. Under the law and the facts described in this letter, American Home clearly is not entitled to any summary judgment in its favor. On behalf of our clients, we request and insist that it withdraw the motion for summary judgment

insofar as it pertains to American Home. If it fails to do that, we may seek such attorney's fees and costs for having to defend against the summary judgment motion pertaining to American Home when it is clearly without merit. Again, by November 5, 2004, please advise us of whether American Home will withdraw the motion for summary judgment insofar as it pertains to it.

If you have any comments or questions concerning the above matters, please contact me.

Very truly yours,

Law Offices of Wayson Wong
A Professional Corporation

Wayson W. S. Wong

Enclosure
WWSW:pjw
cc: Mr. and Mrs. George Watson

do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Superior Court of Guam
Dated at Hagatna, Guam

JUL 1 0 2006

Teresita S. Perez

If a "newly acquired auto" replaces a vehicle shown in the Declarations, coverage is provided for this vehicle without your having to ask us to insure it.

**b.** Collision Coverage for a "newly acquired auto" begins on the date you become the owner. However, for this coverage to apply, you must ask us to insure it within:

**(1)** 14 days after you become the owner if the Declarations indicate that Collision Coverage applies to at least one auto. In this case, the "newly acquired auto" will have the broadest coverage we now provide for any auto shown in the Declarations.

**(2)** Four days after you become the owner if the Declarations do not indicate that Collision Coverage applies to at least one auto. If you comply with the 4 day requirement and a loss occurred before you asked us to insure the "newly acquired auto", a Collision deductible of $500 will apply.

**c.** Other Than Collision Coverage for a "newly acquired auto" begins on the date you become the owner. However, for this coverage to apply, you must ask us to insure it within:

**(1)** 14 days after you become the owner if the Declarations indicate that Other Than Collision Coverage applies to at least one auto. In this case, the "newly acquired auto" will have the broadest coverage we now provide for any auto shown in the Declarations.

**(2)** Four days after you become the owner if the Declarations do not indicate that Other Than Collision Coverage applies to at least one auto or you comply with the 4 day requirement and a loss occurred before you asked us to insure the "newly acquired auto", an Other Than Collision deductible of $500 will apply.

---

## PART A – LIABILITY COVERAGE

### INSURING AGREEMENT

**A.** We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident. Damages include prejudgment interest awarded against the "insured". We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted by payment of judgments or settlements. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy.

**B.** "Insured" as used in this Part means:

**1.** You or any "family member" for the ownership, maintenance or use of any auto or "trailer".

**2.** Any person using "your covered auto".

**3.** For "your covered auto", any person or organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this Part.

**4.** For any auto or "trailer", other than "your covered auto", any other person or organization but only with respect to legal responsibility for acts or omissions of you or any "family member" for whom coverage is afforded under this Part. This Provision **(B.4.)** applies only if the person or organization does not own or hire the auto or "trailer".

### SUPPLEMENTARY PAYMENTS

In addition to our limit of liability, we will pay on behalf of an "insured":

**1.** Up to $250 for the cost of bail bonds required because of an accident, including related traffic law violations. The accident must result in "bodily injury" or "property damage" covered under this policy.

**2.** Premiums on appeal bonds and bonds to release attachments in any suit we defend.

**3.** Interest accruing after a judgment is entered in any suit we defend. Our duty to pay interest ends when we offer to pay that part of the judgment which does not exceed our limit of liability for this coverage.

**4.** Up to $200 a day for loss of earnings, but not other income, because of attendance at hearings or trials at our request.

**5.** Other reasonable expenses incurred at our request.

### EXCLUSIONS

**A.** We do not provide Liability Coverage for any "insured":

**1.** Who intentionally causes "bodily injury" or "property damage".

**2.** For "property damage" to property owned or being transported by that "insured".

I hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam

JUL 1 0 2006

Teresita S. Perez

10/30/04

Nora, for the Watson Case policy, just look for similar definitions of insured
& fax me that & the declarations page,
that's all...

Copyright, Insurance Services Office, Inc., 1997     PP 00 01 06 98

F. Watson (

Wayson W. S. Wong, Esq.
Law Offices of Wayson Wong
A Professional Corporation
142 Seaton Blvd., Suite 203
Hagatna, Guam 96910
Tel:(671) 475-7448

*Attorney for Plaintiffs*

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| SHAUNANNETTE D. WATSON and GEORGE L. WATSON, | CIVIL CASE NO. CV 0318-02 |
| Plaintiffs, | |
| vs. | |
| GARRY M. PASCOE, AMERICAN HOME ASSURANCE COMPANY, and DOE DEFENDANTS 1 - 10, | |
| Defendants. | |

TRANSCRIPTION OF
DEPOSITION OF

## GARRY M. PASCOE

August 12, 2004

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam
Dated at Hagatna, Guam

JUL 1 0 2006

Teresita S. Perez

PREPARED BY:    Jeffrey W. Anderson
Palabra Electronic Recording/Transcribing
P.O. Box 9787, Tamuning, Guam 96931
671-687-6099 • Fax: 671-734-3440

EXHIBIT " B "

A.  No.

Q.  Okay.  Was the claim against primarily for property damage to the other car?

A.  That's correct.

Q.  Who paid that claim?

A.  I don't know.  It was turned over for a resolution with the base legal office.

Q   Okay.

A   I believe the department of Justice in Anchorage got the case dismissed because the plaintiff filed against me rather than against the Federal Government.

Q.  In terms of the day of this accident, where had you been just prior to the accident?

MR.  TIMBLIN:   Wayson, we're talking about what, we're arguing about were the Alaskan incident.

BY MR. WONG:

Q.  Let me clarify, in terms of March the 13th 2000, and the accident that occurred on that date, where had you been just before the accident?

A.  I was at my residence.

Q.  Where was that at?

A.  It was located on Andersen Air Force

1      A.   If the Fire Chief decided to detail me
2  into that position, he has that authority and
3  prerogative.

4      Q.   Okay, you would be then the Acting
5  Deputy Fire Chief?

6      A.   Correct.

7      Q.   But at the time of this particular
8  accident, you were the actual Deputy Fire Chief
9  but also the Acting Fire Chief...

10     A.   Correct.

11     Q.   ...because of the circumstances that you
12 described, correct?

13     A.   Correct.

14     Q.   Okay.  Now, was the Fire Department for
15 your work located at Andersen Air Force Base?

16     A.   Yes, the Fire Department is located on
17 Andersen Air Force Base.

18     Q.   There is the Military Airlift Command
19 terminal at Andersen, correct?

20     A.   Yes.

21     Q.   Has the Fire Department ever since the
22 day of this accident 'til now been located
23 adjacent to that terminal?

24     A.   Yes they have.

25     Q.   I know it's gone through renovations but

**PALABRA**
Jeffrey W. Anderson
Electronic Verbatim Reporter/Notary Public
Tel.(671)687-6099 • Fax:(671)734-3440

1   it's been the Fire Department, it's been at the

2   same location since the year 2000 until now; is

3   that correct?

4       A.  Yes, that is correct.

5       Q.  Was your office as Deputy Fire Chief and

6   Acting Fire Chief located in that building where

7   the Fire Department was?

8       A.  Yes it was.

9       Q.  Okay.  Is it fair to say that you

10  probably went to work at that building next to

11  the MAC Terminal at about 7 o'clock on the

12  morning of the accident?

13      A.  Yes.

14      Q.  Okay.  During that particular time, did

15  you usually go home for lunch?

16      A.  It depended what activities my calendar

17  had for the day whether I had opportunity to go

18  to lunch or if I just brought lunch with me, or

19  if I went and had luncheon meeting.

20      Q.  In the Fire Departments here in Hawaii,

21  our personnel are required to be on duty for 72

22  hours at a time, and while they are on duty they

23  are provided with meals.  Did the Fire personnel

24  at Andersen Air Force base have the similar

25  shift/lodging and feeding provision for

1  for that morning. Yes.

2      Q.   Okay.   So the requirements of yourself

3  as the Fire Chief were to be at the station or

4  unless you duties took out of the station during

5  the period from 7 to at least 4:30 or 5 p.m. in

6  the evening.   7 in the morning to 4:30-5 p.m. in

7  the evening Monday thru Friday; is that correct?

8      A.   Yes,   with   an   opportunity   for   lunch

9  whenever it fit my schedule.

10     Q.   Okay.   I guess that's nine hours if you

11 go in at 7 and quit at 5.   If that's the case,

12 would it be the usual that you pick and hour for

13 lunch?

14     A.   That would be the norm, yes.

15     Q.   Okay.   On Saturdays and Sundays, unless

16 there was an emergency or you had to be in for a

17 reason, you spent pretty much with family; is

18 that correct?

19     A.   Yes.

20     Q.   Okay.   Now when you were at home, I've

21 been told that you received a call from the

22 station; is that correct?

23     A.   No, that is not correct.

24     Q.   Please tell me what happened while you

25 were at home to cause you to leave your home?

**PALABRA**
Jeffrey W. Anderson
Electronic Verbatim Reporter/Notary Public
Tel.(671)687-6099 • Fax:(671)734-3440

1    A.  Anytime that I am, when I was Acting
2  Fire Chief, I always had my brick with me.
3  Well, my brick is my radio, my CrashNet radio.
4  At the time that I was at home having lunch, I
5  heard the emergency dispatch over my radio that
6  caused me to break away from my lunch and begin
7  travel back to the fire station.

8    Q.  Now, the travel that you were making was
9  in your personal vehicle; is that correct?

10    A.  Yes.

11    Q.  What type of vehicle was that at the
12  time of this accident?

13    A.  1988 Nissan Maxima.

14    Q.  That vehicle was owned by you and not
15  the United States Air Force or any other United
16  States Government Agency; is that correct?

17    A.  Yes, I was the owner of that vehicle.

18    Q.  Okay.  And you had it insured with
19  American Home Insurance Company?

20    A.  I had it insured --

21    Q.  Is that --

22    A.  I had it insured with GEICO's overseas
23  affiliate, which is International Insurance
24  Underwriter's who through some agreement with
25  American Home Insurance provides coverage.

**PALABRA**
Jeffrey W. Anderson
Electronic Verbatim Reporter/Notary Public
Tel.(671)687-6099 • Fax:(671)734-3440

1      Q.   What was the emergency, specifically?

2      A.   The   emergency   involved   a   C-H46

3  helicopter.   It was an in flight emergency, with

4  a reported smoke and fire.   And I don't recall

5  how many personnel were on board.

6      Q.   I'm familiar with a C-H47.   In the Army,

7  we called them Chinnooks -- C-H-I-N-N-O-O-K-S.

8  Is the C-H46 a similar version?

9      A.   I believe it's smaller than a Chinnook.

10     Q.   Okay.     But   it's   got   a   front-end

11  propeller and a rear-end propeller that both

12  propel the helicopter.

13     A.   Yes,   it   has   a   horizontal   forward

14  propeller and a vertical rear propeller.

15     Q.   The Chinnooks I know have to horizontal

16  propellers,   one   in   the   front   and   one   in   the

17  rear.   But anyway, about how many people can one

18  of these Chinnooks carry, approximately, or one

19  of these C-H46 carry.

20     A.   I believe a 46 can carry upwards of a

21  dozen people.

22     Q.   Okay.   Did   you   ascertain   from   the

23  message that you got over the brick where the

24  helicopter was at the time it was declared this

25  emergency?

**PALABRA**
Jeffrey W. Anderson
Electronic Verbatim Reporter/Notary Public
Tel.(671)687-6099 • Fax:(671)734-3440

1    correct?

2        A.   No, my intention was to drive to the

3    fire station and get in my Chief 1 command

4    vehicle and go out to the airfield.

5        Q.   I appreciate that.  But, in terms of the

6    answer to your question, my question, if you

7    didn't have that pass, you couldn't be in the

8    airfield, correct?

9        A.   Not in my P.O.V., no.

10       Q.   Okay.  So your intention was to get back

11   to the station and use your government assigned

12   vehicle to try and get to the emergency if it

13   was someplace of some distance, I mean if the

14   aircraft landed in front of the fire station you

15   wouldn't have to do that, correct?  Hello?

16       A.   Yes.

17       Q.   Okay.

18       A.   I'm saying yes to your hello inquiry.

19   I'm not saying yes to your question because I

20   don't think I quite followed it.

21       Q.   Okay, your intention when you left your

22   home was to return the station, so that you

23   could get into your government provided

24   government vehicle to get to the sight of any

25   emergency, correct?

1    A.  Yes, that is correct.

2    Q.  And if the emergency happened right in
3  front of the fire station, you wouldn't have to
4  get into your government provided vehicle.  You
5  just go into the station and take off from
6  there, correct?

7    A.  No, I would still get into my vehicle
8  because there is a command elements and maps and
9  other checklists that I use for such
10  emergencies.

11   Q.  Okay.   So you left your home at
12  approximately what time?

13   A.  Well, not having the response logs from
14  that day in front of me, it would have been
15  within minutes of hearing that emergency
16  dispatch.

17   Q.  The accident is reported, at least on
18  the government, or Military Police information
19  and documents we received at 12:24 hours.   I
20  asked my secretary to provide you with a copy of
21  those documents.   They are documents that
22  because of I guess privacy act requirements have
23  been blacked out in certain places.  Do you have
24  the set in front of you?

25   A.  Yes, I have a set of documents with the

1      "As I approached the first vehicle, I

2  eased into the left lane and prepared to pass."

3      Do you see that?

4      A.  Yes.

5      Q.  Does that indicate to you that Mrs.

6  Watson was the first vehicle you were attempting

7  to pass as you were traveling back from home

8  back to the fire station?

9      A.  Yes, it does.

10     Q.  Is that what you recall now?

11     A.  Yes.

12     Q.  Okay.  You further mentioned that the

13  driver of the other vehicle turned left in front

14  of you and your car struck the left rear of the

15  vehicle just behind the tire.  Is that correct?

16     A.  Yes.

17     Q.  That's what you said, and is that what

18  you recall?

19     A.  Yes.

20     Q.  Now, when you say that the left rear of

21  the tire, are you talking about -- actually it

22  didn't say tire, it said left rear of the other

23  vehicle, just behind the tire.  I wanted to ask

24  you, did you strike her rear corner panel or did

25  you strike her rear bumper or a combination of

1  both?

2      A.  Well, I don't know about a combination

3  of both, without having eyes at the point of

4  impact, I know that the area that presented

5  itself when she began to turn and I tried to

6  evade, was the left rear panel behind the tire.

7  Now whether or not the design of the bumper was

8  a wrap around that was part of that panel, I

9  don't recall.

10     Q.  When you first saw her vehicle, there's

11 a diagram on page 8 of this Exhibit 1.

12     A.  (Reviews document) Okay.

13     Q.  Do you see that diagram?

14     A.  Yes.

15     Q.  Where was her vehicle on this diagram

16 when you first saw it?

17         MR. TIMBLIN:  Wayson I don't think that

18 question makes any sense.  Either he knows where

19 he thinks the vehicle was, which he can testify

20 to, the diagram shows where whoever wrote the

21 diagram thought it was, but I don't think your

22 question makes any sense.

23         MR. WONG:  Thank you.

24 BY MR. WONG:

25     Q.  Is there a place on this diagram that

1  you could mark to show the location of where
2  Mrs. Watson's vehicle was when you first saw it?

3    A.   I don't recall locations of vehicles.
4  You're asking me...

5    Q.   Okay.

6    A.   ...to recall something that happened in
7  a matter of 5 seconds that is four years old.  I
8  just don't recall, sir.

9    Q.   Alright.   On this diagram, there's a
10 diagram showing Plumeria Boulevard, correct?

11   A.   Yes.

12   Q.   That's running in an approximately north
13 to south direction, according to the direction
14 arrow on the diagram, correct?

15   A.   According to the north direction on the
16 diagram, yes.

17   Q.   And then there's Ulithi Boulevard,
18 that's running in approximately the east to west
19 direction; is that correct?

20   A.   Yes.

21   Q.   And on this diagram, there are
22 crosswalks that are marked, at least what the
23 individual drawing the diagram wants to
24 represent as crosswalks by two parallel lines
25 with diagonal lines between them.  Do you see

**PALABRA**
Jeffrey W. Anderson
Electronic Verbatim Reporter/Notary Public
Tel.(671)687-6099 • Fax:(671)734-3440

1  that?

2  A. Yes, I see those markings, but I see

3  nothing in the legend that indicates that those

4  are crosswalks.

5  Q. Alright. Okay, follow along with me on

6  those particular markings the parallel lines

7  with diagonal lines indicated in them, that look

8  like the approximate locations of where

9  crosswalks would be at the intersection. The

10 question I have for you is, when you first saw

11 Mrs. Watson's vehicle as you were coming upon

12 this intersection, was her vehicle within the

13 intersection? More specifically, was her

14 vehicle within the crosswalk designation

15 markings that the diagram person drew?

16 A. Again, I don't recall specific locations

17 of either vehicles.

18 Q. Okay. Approximately, how far were you

19 away from her vehicle when you first saw it?

20 A. I don't recall.

21 Q. Was it more than 50 feet?

22 A. Mr. Wong, I do not recall how far I

23 was...

24 Q. Okay.

25 A. ...away from her vehicle, when I first